**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Mikayla Denise Regalado, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY JUDGMENT,** |
| | ) | **GRANTING COMMISSIONER'S** |
| vs. | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | **AND AFFIRMING COMMISSIONER'S** |
| Kilo Kijakazi, Acting Commissioner | ) | **DECISION** |
| of the Social Security Administration, | ) | |
| | ) | Case No.  1:22-cv-003 |
| Defendant. | ) | |

Plaintiff Mikayla Denise Regalado ("Regalado") seeks judicial review of the Social Security

Commissioner's denial of her applications for Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act and Supplemental Security Income Benefits ("SSI") under Title XIV of

the Social Security Act. This court reviews the Commissioner's final decision pursuant to 42 U.S.C.

§ 405(g).  For the reasons that follow, the Commissioner's decision is affirmed.

## I.    BACKGROUND

### A.    Personal History

Regalado was 15 years old on the original alleged onset date of disability, 18 years old on

the alleged amended onset date, and 23 years old at the time of her administrative hearing.  Doc. No.

10-9 at pp. 2-11; Doc. Nos. 10-3 at p. 12.  She has graduated from high school.  Doc. No. 10-2 at

p. 20.  She is single and lives alone with an emotional support cat.  Doc. No. 10-3 at p. 12.  She has

a valid driver's license.  Id. at p. 13.  Her work history includes service industry jobs that required

her to cashier, take food orders, deliver food, bus tables, and/or wash dishes.  Id. at pp. 13 through

15.  She relies upon her parents for financial and emotional support.  See e.g., Doc. No. 10-17 at pp.

45-46; Doc. No. 10-25 at pp. 49, 64.

Regalado suffers from chronic asthma and obesity.  Doc. No. 10-3 at p. 17.  She also has longstanding mental health issues.  In addition to depression and anxiety, she suffers from Attention-Deficit Hyperactivity Disorder ("ADHD"), bipolar disorder, an antisocial personality disorder, and a learning disorder in the area of math.  See e.g., Doc. No. 10-12 at pp. 7, 13, and 23; Doc No.. 10-25 at pp. 53. She has at various times been prescribed antidepressants, anti-anxiety medications, antipsychoatic medications, stimulants, and/or mood stabilizers.  See e.g., Doc. No. 10-10 at p. 70-72, 75-76; Doc. No. 10-16 at pp. 2-15, 20-26 . She has a history of methamphetamine and marijuana use.  See e.g., Doc. No. 10-16 at pp. 20-26; Doc. No. 10-20, at pp. 6-7; Doc. No. 10-25 at pp. 63-65.

**B.    Relevant Medical Records.**

**1.    North Dakota Vocational Rehabilitation**

Regalado was referred to North Dakota Vocational Rehabilitation ("NDVR") in November 2015 for services.  Doc. No. 10-12 at pp. 25. NDVR deemed her eligible for services given her various diagnoses and reported impediments, classifying her as a "Priority Category 2- Individual with a Significant Disability." Id. at pp. 25, 35.  It noted that she had no significant functional limits in mobility, communication, self-care, interpersonal skills, work tolerance, but did have significant functional limits in self-direction and work skills as it pertained to employment.  Id. at pp. 30-33.

Regalado continued to receive NDVR services through September 7, 2017.  NDVR's records reflect a counselor periodically checked in with Regalado to review and renew her vocation plan, discuss her employment prospects, and, after she obtained employment, to discuss how her employment was going.  Id. at pp. 35-58.   They also reflect Regalado's case was closed on September 7, 2017, due to successful employment.  Id. at pp. 57-58; Doc. No. 10-10 at p. 34.

2.      **Dakota Family Services**

Regalado presented to FNP Tammy Uleberg for an initial psychiatric evaluation on May 24, 2017.  Doc. No. 10-12 at pp. 7.  According to the FNP Uleberg's report, Regalado identified significant problems with depression and anxiety.  She acknowledged that she had been admitted to the psychiatric unit several times in the past for suicidal ideations but "den[ied] it being problematic now and den[ied] any concerns regarding suicidal ideations."  Id.  She identified some self-harm behavior but "admitt[ed] this being more for attention seeking and making suicidal gestures, particularly in relationships, but she state[d] that has it has not worked all that well so she has not done it in quite some time."  Id.  pp. 7-8.  Finding her to be hypomanic, unfocused, and otherwise distracted, FNP Uleberg: (1) started her on Ability, Pristiq, and naltrexone; (2) encouraged her to participate in some individual therapy; and (3) instructed her to return in three to four weeks. (Id. at pp. 11).

Regalado next presented to FNP Uleberg on July 15, 2017, to address an increase in anger, depression, anxiety and substance abuse issues.  Id. at p. 12.  FNP Uleberg continued Regalado on her prescribed medications, strongly encouraged her to follow through with some individual therapy, and directed her to return in one to three months.  Id. at p. 13.

Regalado followed up with FNP Uleberg for medication management and further assessment. Id. at p. 14.  Among the things discussed during this followup where anger and frustration with her living arrangements.  Id..  FNP Uleberg adjusted her medications, discontinuing one (Abilify) and prescribing another (Geodon), and recommended that she get back into therapy, participate in NA and AA, take a more active role in household activities, and increase her hours at work in an effort to stave of the boredom of which she complained.  Id.

### 3.      Trinity Health

Regalado presented at Trinity ER on July 7, 2019 with suicidal ideations.  Doc No. 10-14 at p. 8 and 12).  She had been using meth.  (<u>Id.</u> at p. 12).  She was described by examining staff as agitated and illogical.  (<u>Id.</u>) She was admitted to Trinity's phsyciatric unit for observation.  <u>Id.</u> at pp 8-10, 13.  She  discharged the following day after she had been evaluated by a psychiatrist.   <u>Id.</u> at p. 10.

### 4.      Eaton and Associates

Regalado reported to a licensed social worker, Dr. Mary Solberg, for an intake on March 3, 2020.  Doc. No. 10-25 at p. 44.  According to Dr. Solberg's  summary of this intake, Regalado had reported that she has received addiction services through North Central Human Service Center (NCHSC), twice voluntarily and three times involuntary, and once been involuntarily admitted to Prairie St. John for substance abuse treatment.  <u>Id.</u> at pp. 43-47.

Regalado met again with Dr. Solberg on March 26, April 15, April 22, 2020.  Doc. No. 10-25 at pp. 37-42.  According to Dr. Solberg's notes, Regalado reported that she had not been getting along with her significant other and was struggling to maintain her sobriety.  <u>Id.</u>

Regaldo returned to Dr. Solberg on July 15, 2020.  <u>Id.</u> at p. 49.  According to the Dr. Solberg's notes, Regalado continued to exhibit the symptoms of her previous diagnoses and that she left halfway through the session. <u>Id.</u>

Dr. Solberg referred Regalado to a licensed clinical psychologist, Dr. Timothy Eaton, in July 2020 for an evaluation.  Doc. No. 10-25 at p. 51.  According to Dr. Eaton, Regalado had previously been evaluated in 2011, 2013, 2014, and 2018.  <u>Id.</u>

Dr. Eaton reported that Regalado's overall intellectual functioning tested in the average range, that she had learning disorders in reading and mathematics, and that she had the capability,

with accommodation, of pursing more advanced academic training.  <u>Id.</u> at p. 53.  Dr. Eaton further reported that Regalado's ADHD was not as prominent but was nevertheless a continuing condition that made it difficult for her to cope with her emotional distress.  <u>Id.</u>  He concluded by stating that Regalado had a combination of mental health conditions that made it difficult for her to adapt to a healthy lifestyle, that she need to stay engaged in long-term counseling and medication management, and that "[h]er focus needs to be on maintaining a lifestyle that will allow her to establish stability for her mental health conditions, and it appears highly unlikely she can do this with any kind of consistent employment."  <u>Id.</u>

Meanwhile, between July 30, 2022, and February 3, 2021, Regalado periodically met with Vickie Weathers for medications reviews.  <u>Id.</u> at pp. 63-65.

### B.    Procedural History

#### 1.    Applications for SSI AND DIB

Regalado respectively filed applications for SSI and DIB on February 26 and March 10, 2020, alleging an onset of disability date of August 9, 2013.  Doc. No. 10-9 at pp. 2-11.

The Social Security Administration ("SSA") denied Regalado's applications on April 24, 2020.  Doc. No. 10-5, at pp. 2-6.  On May 14, 2020, Regalado requested the SSA to reconsider its decision. <u>Id.</u> at pp. 12-13. Following further review of her applications by a physician and disability examiner, the SSA issued notice on June 24, 2020, of its disapproval of Regalado's reconsideration claim.  <u>Id.</u> at pp. 18-20.

#### 2.    Administrative Hearing

On July 28, 2022, Regalado requested a hearing before an Administrative Law Judge ("ALJ").  <u>Id.</u> at pp. 21-22.  The SSA acknowledged the request in a letter dated August 10, 2020.

Id. at pp. 25.

The ALJ convened an administrative hearing on April 13, 2021.  Doc. No. 10-3.  Regalado

appeared via video conference and, with the assistance of counsel, amended her alleged disability

onset date to August 25, 2015, to coincide with her eighteenth birthday.  Id. at p. 3.  A Vocational

Expert ("VE") appeared by telephone.  Id. at p. 7.

### a.   Regalado's Testimony

Regalado testified that her asthma is more of an issue during allergy season or when it is

cold.  Doc. No. 10-3 at p. 16.  She further testified that she uses an inhaler as needed, which is "not

really that often."  Id.

Regalado next testified that she has issues with her back, knees, and ankles that limit her

ability to lift heavy things.  Id. at p. 17.  She attributed these issues to injuries she sustained as a

child while figure skating and to her flat feet.  Id.  When asked by the ALJ to elaborate on her limits,

Regaldo responded that she struggles to carry a case of water and lift a laundry basket but can

occasionally manage a bag of cat litter.  Id. at p. 17 and 19.  She further shared that she has received

physical therapy, albeit not recently, and is supposed to wear orthotics every once in a while.  Id.

at pp. 17 and 19.

With respect to her stamina, Regalado testified that she exhausts easily and cannot walk for

thirty minutes.  Id. at 18-19.  With respect to her level discomfort when seated, Regalado testified

that she cannot sit still for a long time as she feels "antsy" but that Straterra, which she takes for her

ADHD, is helpful.  Id. at pp. 19 and 20.

When asked about other medications she had been prescribed for mood and depression,

Regalado responded that they had proven helpful and that her thoughts are not as dark as they once

were, but that her depression is still not under control, that she lacks motivation, and does not typically finish what she starts as she loses interest.  Id. at pp. 21 through 23.   She later testified that, with respect to her depression, anxiety, and ADHD, she does not feel as helpless or hopeless as she used to and  that her self-esteem and self image have improved, but that she remains easily overwhelmed, her thoughts are perpetually disorganized, and that, depending on the task at hand or her state of mind, she struggle to maintain focus for an extended period of time.  Id. at pp. 31 through 34.

When asked to describe her typical day, Regalado responded that her morning routine varies but that she "usually ends up leaving with my cat, and then, I just go out and about, hang out with friends." Id. at p. 23.  She further testified that, when at home, she will start a task, such as cleaning or washing cloths, but will rarely if ever see it through to completion.  Id. at p. 25. When asked whether she remembers to take her medications, she responded that she needs someone to remind her "every once and a while" but that she "pretty much takes them on [her] own." Id.  When subsequently asked to describe her typical "bad day," Regalado responded she does little more than sleep and eat. Id. ap. 35.  She added that she experiences such days approximately every other week. Id.

Regalado went on to testify that she did not feel capable of simultaneously maintaining both an adult lifestyle and working at the same time because she has an attention deficit, is easily overwhelmed, and cannot finish things.  Id. at pp. 36-38.   She also testified that her parents generally and her mother in particular give her prompts or reminders and otherwise assist her with getting groceries, budgeting, and paying bills.  Id. at pp. 36 through 38.

With respect to her past substance abuse, Regalado acknowledged that she had used

methamphetamine. Id. at p. 39.  However, she denied that her past methamphetamine use had not affected her while she was trying to work and further advised that she has not used methamphetamine in almost a year.  Id. at p. 39.

### b.    VE's Testimony

The ALJ first asked the vocational expert whether a hypothetical younger person with a high school education with no exertional limitations could perform Regalado's past work if she: (a) could have no more than occasional exposure to pulmonary irritants like dust, fumes, odors, and gases; (b) could have no exposure to hazards like unprotected heights and fast and dangerous machinary; (c) could understand, remember, and carry out simple, routine tasks and maintain concentration, persistence, and pace for two-hour segments throughout an eight-hour day; (d) could appropriately respond to brief and superficial interactions and the general public throughout an eight-hour workday; and (e) respond appropriately to the routine changes found in an unskilled work setting. Id. at 43.   The VE responded that such a person could perform fast food work and  cashier work. Id. at 43-44.   The VE added there was other unskilled medium work that such a person could perform and offered cook helper work and laundry work as examples.  Id.

Second, the ALJ asked the VE to address the vocational impact of the hypothetical person's inability to maintain concentration, persistence, and pace for two-hour segments throughout an eight-hour day on.  Id. at pp. 44-45.   The VE responded that such a hypothetical person would be unable to sustain competitive work.  Id.

Third , the ALJ asked the VE to address how a hypothetical person would be impacted if her psychologically based symptoms resulted in her late arrival, early exit, or absence from her job.  Id. at p. 45.  The VE responded that such a pattern of excessive absenteeism would not allow someone

to sustain competitive work.  Id.

**C.     ALJ's Decision**

On May 24, 2021, the ALJ issued a written decision.  Doc. No. 10-2 at pp. 16-33. Employing the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520, the ALJ concluded that Regalado "was not under a disability, as defined by the Social Security Act from August 9, 2023, through the date of [her] decision." Id.

Specifically, at steps one and two, the ALJ recognized that Regalado had not engaged in any substantial gainful activity since August 15, 2015, the alleged amended onset date, and suffered from the following medically determinable impairments that significantly limited her ability to perform basic work activities: ADHD; bipolar disorder; specific learning disorder, math; antisocial personality disorder; methamphetamine abuse; and obesity.  Id.  Conversely, the ALJ concluded that Regalado's asthma was non-severe as it had not required aggressive treatment and otherwise appeared to be medically managed given the dearth of treatment records.  Id.  The ALJ also concluded that Regalado's back, knee, and ankle issues did not constitute a medically determinable impairment given the dearth of objective medical evidence to evince they posed a significant or ongoing problems for Regalado.  Id. at pp. 19-20.

At step three, the ALJ concluded that Regalado's medically determined impairments did not alone or in combination meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. § 404, Subpart P, Appendix 1.   Id. at pp. 20.

At step four, the ALJ determined that Regalado was physically capable of performing a full range of work at all exertional levels provided there that her exposure to pulmonary irritants and to hazards, such as unprotected heights and fast and dangerous moving machinery, were limited.  Id.

at p. 22.  In doing, the ALJ acknowledged that Regalado's medically determinable impairments could reasonably be expected to cause some of her alleged symptom.  Id. at pp. 22-31.  However, the ALJ discounted Regalado's subjective claims regarding the intensity, persistence, and limiting effects of her symptoms as well as statements made by Regalado's mother on the grounds that they were substantially supported by the objective medical evidence.  Id. at pp. 22-31.

The ALJ declined to defer or otherwise afford controlling weight to any prior administrative medical findings or medical opinions regarding Regalado's conditions.  Id. at pp. 29.  That being said, the ALJ found the assessment of Regalado's psychological impairments and symptoms by consulting physicians to be somewhat persuasive because they were supported by the objective medical evidence. Id.  Conversely, it found the assessment of Regalado's employment prospects by Dr. Eaton to be unpersuasive Id. at p. 30.

The ALJ next considered whether Regalado was able to perform her past relevant work.  Id. at 31-32.  Based on the VE's responses to the hypotheticals posed at the administrative hearing, the ALJ concluded that she could not perform this work.  Id. at 31-32.

At the fifth and final step of his analysis, the ALJ concluded there were unskilled jobs existing in significant numbers in the national economy that Regalado was capable of performing given her age, education, work experience, and residual functional capacity ("RFC").  Id. at p. 32.

> The claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations. To determine the extent to which these limitations erode the occupational base of unskilled work at all exertional levels, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as a counter supply, cafeteria food (318.687-010), medium, unskilled, SVP 2 with 37,000 jobs in the national economy; cook helper (317.687-010), medium, unskilled, SVP 2 with 360,000 jobs in the national

economy; and laundry worker (361.685-018), medium, unskilled, SVP 2 with 90,000 jobs in the national economy.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles, and those issues not in the DOT are based on her experience of thirty (30) years per her testimony. Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines.

Id. at Doc. No. 32 and 33. Consequently, the ALJ concluded that Regalado was not under a disability, as defined by the Social Security Act, from August 9, 2013, through the date of the decision.  Id. at p. 33.

### D.    Appeals Council's Decision

Regalado timely requested a review of the ALJ's decision by the Appeals Council.  On November 2, 2021, the Appeals Council denied Regalado's request, rendering the ALJ's decision the final decision of the Commissioner.  Doc. No. 10-2.

### E.    Request for Judicial Review

Regalado initiated the above-captioned action by Complaint on January 5, 2022.  See Doc. No. 1.  On May 16, 2022, she  filed a Motion for Summary Judgment, asserting that reversal or, in the alternative, remand is appropriate given the errors made by the ALJ when calculating her residential functional capacity, assessing her credibility, and referencing the original as opposed to amended alleged onset date in the written decision.  See Doc. Nos. 12 and 13.

 On June 16, 2022, the  Commissioner filed a combined Motion for Summary Judgment and response to Regalado's motion.  See Doc. Nos. 14, 15, and 17.

On June 29, 2022, Regalado filed a response to the Commissioner's motion.  See Doc. No.

16.

## II.    **APPLICABLE LAW**

### A.    **Standard of Review**

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review.  Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988,  993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   It  is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard  "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id.   Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion.  Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole.  See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993).  The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v.

Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

**B.     Law Governing Eligibility for Adult Benefits**

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act"). 42 U.S.C. § 423(a)(1)(D). To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A)." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if he or she applied for work. 42 U.S.C. § 423(d)(2)(A). Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)     whether the claimant is presently engaged in a substantial gainful activity,

(2)     whether the claimant has a severe impairment that significantly limits the

claimant's physical or mental ability to perform basic work activities,

(3)    whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)    whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)    if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's RFC, which is what the claimant can do despite his or her limitations. 20 C.F.R. § 404.1545. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[1] E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005). Claimant's

---

[1] In Polaski, the Eighth Circuit approved a settlement agreement with the Secretary of HHS that contained, in part, the following language, which the court stated was a correct statement of the law with respect to the manner in which subjective pain complaints are to be analyzed:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties

subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole.  Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that are supported by accepted diagnostic techniques and that are not inconsistent with other substantial evidence.  This rule does not apply, however, to opinions regarding disability or inability to work because these determinations are within the exclusive province of the Commissioner.  The Eighth Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).
> . . . .
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir.

---

and treating and examining physicians relating to such matters as:
    1. the claimant's daily activities;
    2. the duration, frequency and intensity of the pain;
    3. precipitating and aggravating factors;
    4. dosage, effectiveness and side effects of medication; and
    5. functional restrictions.
The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.]
739 F.2d at 1322.  The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner.  The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law.  20 C.F.R. § 404.1504. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996).  And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  Pearsall v. Massanari, 274 F.3d at 1217.

## III.   DISCUSSION

Regalado does not assert that she suffered from an impairment or combination of impairments that are presumptively disabling.  Rather, she asserts that the ALJ failed to take all of impairments in their interrelationship into consideration when determining her RFC.  In so doing, she emphasizes that her mental health struggles date back to when she was a juvenile as evinced by the objective medical evidence.  Doc. No. 13.  She also emphasizes that her mental health issues tend to "ebb and flow."  She further, she asserts that the ALJ failed to properly credit her subjective complaints, which she maintains are consistent with the objective medical evidence as they are reflective of this "ebb and flow."  Further, she asserts that her ability to perform some activities of daily living are not reflective of her ability to perform work-related activities on a sustained and regular basis. In her reply brief, she takes exception to the Commissioner's reliance on three instances over a span of year and a half were she had presented as normal, cooperative and satisfied with her current treatment, intimating that these three instances do not paint an accurate picture of her mental health struggles and do not constitute a valid basis for discounting her credibility. Finally,

she points out the ALJ repeatedly referenced her original as opposed to amended onset date in the written decision.

In her responsive brief, the Commissioner avers that the ALJ did address all of Regalado's impairments singly and in combination and that it is telling that Regalado did not point out or identify the specific impairment(s) that she claims were given short shrift. The Commissioner also asserts that the ALJ properly considered Regalado's subjective complaints in conjunction with the record evidence and that her assessment of Regalado's credibility is entitled to deference. As for the written decision's reference to the original as opposed to amended onset date, the Commissioner asserts that this is harmless error.

### A.   Consideration of Impairments Alone and in Combination

Reagalato's assertion the ALJ failed to consider all of her impairments and their ebb and flow over time is specious. The record evinces that the ALJ reviewed the entirety of her relevant medical history and with it Regalado's highs and lows and addressed all of her impairments when assessing their severity and again when determining her RFC.

With respect to Regalado's asthma and its severity, the ALJ concluded that it was not a severe impairment as the objective medical evidence established that was it medically managed and otherwise amenable to control through adherence to recommended treatment and medication compliance. Doc. No. 10-2 at p. 19. The ALJ also concluded that Regalado's knee, ankle, and foot issues did not constitute a severe impairment as the objective medical findings were largely unremarkable, there was otherwise a dearth of objective medical evidence to indicate these required much if any regular or ongoing treatment, and that Regalado had not indicated that she had any physical issues on her function report.  Id. at pp. 19-20.

With respect to the severity of Regalado's mental impairments, the ALJ first reviewed the

report from a consulting examiner and the progress notes.  Id. at p. 20.  The ALJ then turned to the

"paragraph B" criteria, which require mental impairments to result in one extreme limitation or two

marked limitations in a broad area of function, and "paragraph C" criteria.  Id. at pp. 20-21.  Taking

into consideration, among other things, the fact that Regalado had graduated from high school and

record evidence regarding Regalado's activity level and social interaction, the ALJ concluded that

she did not meet "paragraph B" criteria as: (1) her limitations with respect to understanding,

remembering, or applying information were mild; (2) limitations with respect to her ability to

interact with others were moderate; (3) difficulties with concentration, persistence, and maintaining

pace were moderate; (4) and her limitations with adapting or management herself were moderate.

Id. at p 20. The ALJ further  concluded that Regalado could not satisfy "paragraph C" criteria as she

had not demonstrated an ongoing reliance on medical treatment, mental health therapy, psychosocial

support, or a high structured setting or that she had minimal capacity to adapt to changers in her

environment or the demands of daily life.  Id. at pp. 20-21.

Moving on to the RFC determination, the ALJ dedicated six plus single-spaced pages to a

chronicle of Regalado's treatment history over a span of years and made the following observations

about Regalado's physical and mental infirmities:

> [Regalado] does have longstanding mental health issues, which have obviously been
> exacerbated by her drug use.  She reported at the hearing that she had not used
> methamphetamine for a year, and that she was currently off probation.  The record
> indicates that she has a high level of dependence on her mother, who provides for her
> financially, and upon whom the claimant relies for social support.  The claimant
> appeared to have low motivation fo working or any type of self sufficiency.  She was
> not in counseling (she alleged at the hearing that her last counselor stated she needed
> more help and dropped her; however, this is not indicated in the file).  Vickie
> Weathers saw her for medical management and suggested that she needed more than
> "nothing but waiting . . . The undersigned notes that Dr. Eaton's psychological
> evaluation is support of her allegation; however, this evaluation was done in July
> 2020, and there are only three (3) pages of treatment records from the facility at this
> time.  This was confirmed with the Representative at the hearing.  Accordingly, this

18

very limited mental health treatment since July 2020 is not commensurate with the level of dysfunction and need for ongoing treatment suggested by Dr. Eaton.

In addition, her treatment notes when seen for annual exams and other minor issues do not reflect an individual who is unable to attend to her personal needs or make decisions for herself, as the Representative suggested.  She was able to fully participate and complete treatment (and treatment assignments) on her own, which shows that she can follow through and complete tasks when she has the motivation to do so.  She drives, and takes care of herself, her apartment and her cat.  At the hearing, she stated that she got up every day, took a shower, straightened her hair and put on make-up before she left the apartment.  Then, in response to her Representative, she stated that she would not take a shower at all some day and would not cry for no reason. She sated that she kept her job at ND Asia for over a year, and worked full-time, which is strong evidence that she can maintain.

As for her physical allegations, the claimant testified that she hurt her back when she was young; however, there was no treatment.  Her work history and testimony reveals that she has worked as a car hop on roller skates/roller bales, delivered food and as a dishwasher, with no physical issues.  She does have a diagnosis of asthma; however, testing and treatment do not indicate that this poses a significant limitation for her.  There is no ongoing follow-up visits after her ER visits with complaints of knee and ankle pain.  She has indicated that for the most part she was pretty healthy.

In addition, the undersigned considered the impact the claimant's obesity has on her limitations in accordance with SSR 19-2p, which provides important guidance on evaluation obesity in adult and child disability claims.  Obesity is not a listed impairment; however the functional limitations caused by the MDI of obesity, alone or combination with another impairment(s), may medically equal listing . . . .  The undersigned concludes that the claimant's obesity contributes to the functional limitations, but does not result in limitations in excess of the residual functional capacity stated herein.

Doc No. 10-2 at pp. 30-31.

### B.    Credibility Determination

In analyzing a claimant's subjective complaints, such as pain, an ALJ must consider: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001). Other factors also include the claimant's "relevant work history and the absence of objective medical evidence to

support the complaints." Id. (quotation omitted). These factors are derived from the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). While ALJs must acknowledge and consider these factors before discounting a claimant's subjective complaints, they "need not explicitly discuss each Polaski factor." Goff, 421 F.3d at 791 (quotation omitted). ALJs may discount claimants' complaints if there are inconsistencies in the record as a whole. The court will generaly defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (internal quotation omitted).

Here, the ALJ properly considered the Polaski factors, and articulated bases for discounting Regalado's credibility. In addition to treatment notes and the three inconsistencies highlighted by the Commissioner, the ALJ also considered Regalado's apparent ability to participate in and complete treatment, her reported activities of daily living, her ability at one point to sustain employment with the same employer for one year, and the apparent lack of mental health treatment since 2020. The ALJ also relied on the assessments of medical consultants, who opined that Regalado suffered from moderate limitations but could be persistent in tasks and work in proximity with others.

The ALJ's bases for discounting Regalado's subjective complaints was valid. See Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir.2008). Finding substantial evidentiary support in the record for her finds, the court defers to the ALJ's adverse credibility determination.

C.    RFC Determination

The ALJs bear "the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). That said, a claimant's RFC is a medical question and "at least some" medical evidence must support the

ALJ's RFC determination.  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Accordingly, "the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (internal quotation omitted).

As discussed above, the ALJ properly considered and weighed the available medical evidence and Regalado's testimony. There is a dearth of evidence to suggest that Regalado's, asthma, obesity and reported knee, ankle and foot issues pose any and serious limitations on her capacity to engage in meaningful activity.  See e.g., Doc. No. 10-16 at pp. 20-26, 30-31; Doc. No. 10-17 at pp. 9, 47-48.  The results of psychological evaluations reflect that Regalado's overall intellectual functioning is in the average range.  Doc. No. 20-25 at pp. 50-53.  Regalado's impairments appear to have been exacerbated by substance abuse.  However, Regalado has been through treatment and she has  Regalado has been prescribed medications for her condition and reports that she has not suffered any serious side effects that the medications have helped.  See e.g, Doc. No. 10-2 at pp. 27-28; Doc No. 10-12 at p. 101; Doc. No. 20-25 at pp. 33-36, 38, 43-47, 57. The consulting psychological consultants both concluded that Regalado's mental impairments posed no more than a moderate limitation.  Doc. No. 10-2 at pp. 22, 29; Doc Nos. 10-4 at pp. 8-13, 40, 43-47.

The court finds that ALJ's RFC determination—which is based on the ALJ's independent review of the medical record, treatment notes, the conclusion of agency consultants, Regalado's testimony, Regalado's sporadic work history, and Regalado's daily activities–has substantial evidentiary support.  See  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir.2002). Based on the ALJ's RFC assessment, a Vocational Expert testified there was work in the national economy that Regalado could perform.

**D.** **Written Decision's References to the Alleged Onset of Disability Date**

The ALJ properly noted Regalado amended her alleged disability onset date during the administrative hearing.  However, in the written decision, the ALJ twice referred to Regalado's original onset date instead of her amended onset date.   The court agrees with the Commissioner that these references were a scrivener's error and therefore harmless as it is apparent from the record that the ALJ considered the full relevant time period from Regalado's amended alleged onset date through the date of the written decision.

Regalado bears the burden of showing that any alleged error was harmful. See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) (citing, e.g., Nelson v. Apfel, 131 F.3d 1228, 1236 (7th Cir. 1997)).   However, she has made no such showing with respect to the alleged onset date referenced in the order.

## IV.   <u>CONCLUSION</u>

In this case, the ALJ correctly applied governing law, regulations, and policy guidance, and there is substantial evidence supporting the Commissioner's decision.  As long as there is substantial evidence supporting the decision, this court may not reverse it simply because there is substantial evidence supporting a contrary outcome or because the court would have decided the case differently.  Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001); see also Schmitt v. Kijakazi, 27 F.4th 1353, 1361 (8th Cir. 2022).

Accordingly, the Commissioner's Motion for Summary Judgment (Doc. No. 14) is **GRANTED**, Regalado's Motion for Summary Judgment (Doc. No. 12) is **DENIED,** and the Commissioner's decision is **AFFIRMED.**

**IT IS SO ORDERED.**

Dated this 27th day of February, 2024.

*/s/ Clare R. Hochhalter*
Clare R. Hochhalter, Magistrate Judge
United States District Court
